UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| CATHERINE SHEAR, | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) No. 1:18 CV 178 RWS |
| ANDREW M. SAUL, Commissioner Social Security Administration | ) |
| Defendant. | ) |

# MEMORANDUM AND ORDER

Plaintiff Catherine Shear brings this action pursuant to 42 U.S.C. §§ 405(g) seeking judicial review of the Commissioner's decision denying her application for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 et seq. Because the Commissioner's final decision is supported by substantial evidence on the record as a whole, I will affirm the decision of the Commissioner.

***BACKGROUND[1]***

On March 27, 2014, Plaintiff Catherine Shear went to the Community Counseling Center. An intake note revealed restless motor behavior and anxious

---

[1] The following medical information is taken from Shear's Statement of Uncontroverted Material Facts (Doc. 18) and the Commissioner's Statement of Additional Material Facts (Doc. 23).

mood. Shear was diagnosed with Bipolar II Disorder. She was treated "regularly" until November 21, 2014.

On November 21, 2014, Shear was in a motor vehicle accident in which she was seriously injured. She sustained multiple fractures including to her right distal clavicle, right proximal humerus, left supra condylar humerus, left sacral ala, left acetabular, left superior and inferior pubic rami, right subtrochanteric femur, left femoral neck, right open pilon, left tibial plateau, and several vertebrae. In addition to her fractures Shear sustained other injuries including a scalp laceration, a subdural hemorrhage, a subarachnoid hemorrhage, multiple rib fractures, and a pulmonary laceration. Shear was in the hospital from November 21, 2014 through December 31, 2014. She underwent multiple surgeries when she was hospitalized to repair her fractures and injuries including the removal of her spleen and part of her left lung.

Shear was transferred to a rehabilitation facility until February 24, 2015. She had been prescribed Celexa and Seroquel to help her mental state and to come to terms what had happened to her. On March 10, 2015, Shear saw Dr. Scott Kaar regarding the extremely limited motion Shear had in her right shoulder. On March 16, 2015, Dr. Kaar performed surgery on the right shoulder.

On April 3, 2015, Shear was seen at the Community Counseling Center by Dr. Fred Gaskin, M.D. for the first time after her accident. Dr. Gaskin noted that

Shear was alert, oriented, had "ok" speech, and an appropriate affect. Her mood was neither manic nor depressed. DE. Gaskin continued to prescribe Seroquel and Celexa.

On April 14, 2015, Shear returned to the hospital for a follow up orthopedic examination with Dr. Joanie M. Columbia. Shear reported that she was doing well and was able to walk 20 feet without an assistive device. She did not require pain medications any longer and took Tylenol as needed. Her left hip was "popping." Her right humerus continued to be subluxed and additional surgery was planned.

On April 21, 2015, Shear met with her mental health counselor Walter Major for individual therapy. Major observed that Shear was in a friendly mood, cooperative, and talkative. She had a matching mood and affect. Shear had logical, sequential, and connected thoughts, and she was properly oriented. She exhibited appropriate motor activity.

On May 19, 2015, Shear returned to see Dr. Kaar about her right shoulder. Dr. Kaar observed Shear to be alert, oriented, and pleasant to speak with. She walked with a normal gait, and she had good neck range of motion in all directions. Shear had no problems with her left shoulder. He right shoulder was neurovascularly intact with some proximal tenderness to palpation. Her shoulder had restricted passive and active range of motion to 90 degrees of elevation. She had somewhat reduced (4/5) abduction strength. On June 15, 2015, Dr. Kaar

performed another surgery on Shear's right shoulder.  This surgery resulted in improved alignment but the inferior subluxation of the humerus remained, possibly related to joint effusion.

On June 9, 2015, state agency psychologist James Morgan Ph.D. reviewed the evidence in Shear's file in connection with her SSI application.  He concluded that Shear was moderately limited in her ability to carry out detailed instructions and maintain attention and concentration for extended periods.  He assessed Shear as having moderate difficulties in maintaining concentration, persistence or pace.

On July 24, 2015, Shear returned to the Community Counseling Center and reported to Dr. Gaskin that she was doing "pretty good."  She stated that she felt down because she could not ride her horses yet.  On September 18, 2015, Shear reported to Dr. Gaskin at the Community Counseling Center that she was starting to be a happy person again.  She started riding horses again.  She said it hurt because she was not used to it.  Shear had a slow deliberate gait but could walk without a cane.  On November 6, 2015, Shear saw Dr. Gaskin again and reported doing "pretty good" and that she was happy.  She rode a horse for the second time for two hours since her accident and was "sore."  He noted that her judgment was "still an issue" apparently based on her alcohol use and rushing into relationships with boys. On January 8, 2016, she returned to Dr. Gaskin and stated that she had

experience some romantic "drama" regarding boyfriends. She said that she was irritabile but was sleeping well. Her prescription for Seroquel was refilled.

On April 1, 2016, Shear returned to Dr. Gaskin and reported that the Seroquel made her feel like a zombie and she stopped taking it two weeks before her visit. She said her plan to get a house with friends did not work out and she was "back with her mom." She said her boyfriend of the past month was not a good driver and made her anxious. That's why she prefers to drive. Dr. Gaskin asked about her drug and alcohol use. Shear stated that she had stopped smoking pot but had used alcohol recently. Dr. Gaskin asked Shear whether her mother limited Shear's use of drugs and alcohol. Shear replied, "I usually just leave when I want to. I just do what I want to." Dr. Gaskin noted the case manager noted that Shear was more stable when she lived with her mom. Shear stated that if someone tried to put her in a residential place she would "kill herself."

On January 31, 2017, subsequent x-rays showed her fractures were healing but she had some residual deformities in her left hip and her right ankle revealed progressive bridging callus across the distal syndesmosis.

On February 15, 2017, Shear had a pain management consultation with Dr. Vivek Manchanda. She complained of pain all over the worst of which was in her right shoulder and ankle. She said her pain was a 7 on a scale of 10. Manchanda

diagnosed pain in her right shoulder, right ankle and joints of the right foot and chronic pain syndrome.

In early 2017, Shear filled out a social security questionnaire regarding her present medications. She recorded that the was taking Keppra and Vimpat to prevent seizures and Voltaren (a non-steroidal anti-inflammatory medication) for pain beginning in December 2016.

On February 23, 2017, x-rays of Shear's left hip revealed sclerosis and mild deformity in the left femoral neck from a healed fracture. She told Dr. John T. Watson that she was back to her usual activities including horseback riding. Shear complained of pain in the left hip and the screws placed in the left hip were removed the next day by Dr. Watson.

On March 15, 2017, Shear returned to Dr. Manchanda for pain management. She said her pain was a 6 on a scale of 10. She was taking hydrocodone for pain. On April 19, 2017, Shear returned to pain management and rated her pain as a 5 on a scale of 10. Her right shoulder and left hip were the most painful. Her right shoulder and right ankle were examined and showed a decrease range of motion and tenderness to palpitation. She continued to have swelling in her right ankle. Her hydrocodone was refilled.

On June 21, 2017, Shear reported to Dr. Manchanda that her pain was worse lately and was aggravated by walking, standing, and weather changes. Shear saw

Dr. Manchanda in follow up visits on August 16, 2017 and September 20, 2017. She reported her pain as a 9 on a scale of 10. An examination revealed decreased range of motion in all planes of her right shoulder and right ankle with mild swelling of the right ankle. Her left knee had swelling and tenderness to palpitation. Her left hip and lumbar paraspinal muscles were tender. She was diagnosed with pain in her right shoulder, right ankle, joints of the right foot, left knee, left hand, right hip, left hip, chronic pain syndrome and low back pain. Shear's prescriptions for hydrocodone and gabapentin were refilled.

On October 3, 2017, Dr. Scott Kaar wrote a letter outlining his treatment of Shear's right shoulder. He stated that she has significant, life-long limitations of her right shoulder which severely limits her range of motion and "prevents her from performing activities of daily living or gainful employment."[2]

On October 11, 2017, J. Tracy Watson, M.D. wrote a letter outlining Shear's injuries. She states that the injuries to Shear's right arm prevent her from lifting it above 50 to 60 degrees which prevents her from lifting anything over five pounds. That injury prevents her from doing daily activities of daily living like brushing her hair or teeth with her right hand. The injuries to her left elbow prevent Shear from lifting anything heavier than a cup of coffee and significantly hinders the use of her

---

[2] This opinion was solicited several months after Shear attended her hearing before the ALJ. Dr. Gaar's opinion that Shear's shoulder limitation "prevents her from performing activities of daily living or gainful employment" is not dispositive.

left arm for personal hygiene and other activities of daily living.[3] Dr. Watson noted that although Shear's lower extremities have healed reasonably well, her bilateral proximal femoral fracture limits Shear's range of motion and limits her ambulatory capacity. Watson says Shear needs ambulatory aids including wheelchair and crutches to get around.[4] Shear's injuries to her tibias hinders her ability to bend her knees and hinders the normal function of her ankles which limits Shear's ability to transfer in and out of a shower or bathtub or from a chair to the dinner table. Shear's ability to stand for prolonged periods of time to perform housekeeping or prepare meals and do basic home care chores is "significantly restricted."

On October 18, 2017, Whitney Wilson, BSW authored a letter for Shear as her service coordinator for the Adult Brian Injury Program of which Shear was a participant since 2015 due to her traumatic brain injury from her accident. Wilson stated that "often times" it is not possible for people with traumatic brain injuries to hold down "competitive employment" for a significant amount of time due to

---

[3] This opinion was solicited several months after Shear attended her hearing before the ALJ. Dr. Watson's statement that Shear cannot lift anything heavier than a coffee cup with her left arm is contradicted by Shear's testimony at her hearing that she could carry 20 pounds with her left arm.

[4] This statement about needing crutches or a wheelchair at the time this letter was written is not supported anywhere else in the record. To the contrary, Shear testified at her hearing that she can walk a mile on a level surface and the record indicates she walks without a cane.

8

memory problems and other behaviors resulting from the brain injury.[5] She also notes that Shear has physical limitations that would "hinder" her ability to work.

*Application for benefits*

On January 28, 2015, Shear protectively filed an application for supplemental security income. She alleged that her disability began on November 21, 2014. On June 10, 2015, the agency denied Shear's claim. Shear requested a hearing before an Administrative Law Judge (ALJ) to challenge the denial of her claim. On April 6, 2017, Shear, accompanied by counsel, attended the hearing before the ALJ. On September 1, 2017, the ALJ issued her decision finding that Shear was not under a disability. On May 22, 2018, the Appeals Council denied Shear's request for review.

At the hearing before the ALJ, Shear testified that she was 24 years old, a high school graduate, and lived with her mother. She had worked part-time as a waitress before her accident. She had anxiety before her accident but it has gotten worse to the point where she is self-conscious about the way she looks. She said that it is hard for her to read because of blurry vision due to her brain trauma from the accident. She testified that she can't do math anymore but can count change. She stated that she has memory loss from her brain trauma and easily forgets what she is doing and doesn't remember how to do a lot of things anymore. Shear

---

[5] This opinion was solicited several months after Shear attended her hearing before the ALJ. This statement is a generalization and does not state that Shear has these issues.

9

testified that she had a history of seizures but had not had a seizure in over a year. She takes Keppra and Vimpat as medication for her seizures.

Shear testified her right shoulder prevents her from lifting anything heavier than five pounds. She said she can barely use her right arm and cannot write letters with her right hand or take notes without her arm going numb. Her left elbow was shattered in the accident which makes it hard for her to pick up things and carry them with her left arm. She can carry up to twenty pounds with he left arm. When she tries to pick up twenty pounds she loses her balance. She also has a loss of feeling in her left hand and fingers. They turn purple and are ice cold.

Shear testified that the loss of half of her left lung makes it hard to breathe. She has two upper and two lower vertebrae that prevent her from standing or walking too long. If she walks too far she has to lay down and use a heating pad. She takes hydrocodone for her pain. She recently had the screws removed from her hip and has pain from the healing process. Her left knee and right ankle hurt. Her right ankle swells up constantly and she cannot walk on it without pain. She is able to walk half a mile on a level surface and then needs to sit down to rest. She is not able to bend over too long because her left knee will lock up or give out on her.

Regarding her mental state, Shear testified that she is very self-conscious and does not like to go around other people. She just wants to keep to herself and

stay at home. She stated that she can "somewhat do laundry" but cannot hold weight with her shoulder. But she can do the wash and put it in the dryer. She does not cook because she cannot use her right arm. She can also sweep and mop. But it takes much linger to do those chores now than before the accident. She has to be very careful with her movements so she will not trip over her feet or bend over and fall down.

    Shear's mother also testified at the hearing. She testified that Shear's limitations vary from day to day depending on her pain level. She tried babysitting but she could not pick up the baby. She tried cooking but got upset because she could not stir. In showering she has to bend over to move her right arm to wash her hair. Shear's mother has to shave Shears' "underarm" for her. She has to be careful with her gait and they want to take the tub out so the Shear can shower more easily.

    Shear's mother testified a lot of Shear's physical limitations are focused on Shear's injured right shoulder. She testified that Shear's day-to-day emotional state was "touchy." She testified that certain things will set Shear off. She cited the example of the cooking incident. Shear's mother thought it would be fun to cook together. But Shear became frustrated when she couldn't stir and it became a "battle of energy, mind, everything came out again." Shear got sad and depressed and went to her room for the day. Shear's mother testified that kind of behavior

happened when Shear tries to do something she has to do and can't do it because of her injuries. Shear's mother gave an example of Shear being outside and playing with the dogs and to feed them she has to bend down to drop food in their bowls. Shear has a hard time getting back up. Shear leaves her dresser drawers open because she can't pull them open. Shear's mother stated that, currently, she felt that Shear should not live alone. Shear's mother felt that Shear had not been showing responsibility for herself. As an example, Shear's mother testified that if she gave Shear money "to go out on or something and there's nothing, no receipts back or anything."

Shear's mother testified that the Adult Brain Injury Program recommends different kinds of aroma therapy, breathing techniques, and meditation to try and release some of Shear's anxiety, stress, and depression.

Shear asserts that she is disabled due to her chronic pain as well as the residual deformity in several areas where Shear sustained her injuries, especially in her right shoulder. She also asserts her anxiety and depression contribute to her disability.

Shear filed the present appeal for judicial review seeking the award of benefits or remand to the ALJ because: 1) the ALJ's determination of Shear's residual functional capacity was not supported by the medical evidence of record;

2) the ALJ did not properly analyze the credibility of Shear's testimony at the hearing.

*Administrative Record*

For evidentiary purposes, I have considered Shear's Statement of Uncontroverted Material Facts (Doc. 18) and the Commissioner's Statement of Additional Material Facts (Doc. 23).

*ALJ Decision*

The ALJ found that Shear had not engaged in substantial gainful activity since January 28, 2015. [Doc. 10-3, TR. at 23]. She also found that Shear suffers from the following severe impairments:

> residuals of status post motor vehicle accident resulting in subdural hemorrhage, multiple rib fractures, pulmonary laceration, bilateral clavicular and scapular fractures, bilateral humeral fractures, right femoral fracture, bilateral tibia fractures, sacral and thoracic and lumbar spine fractures, seizure disorder, chronic pain syndrome, and depression.

[*Id.*] The ALJ found that this combination of severe impairments did not equate to one of the listings denominated in 20 CFR 404, Subpt. P, App. 1. [*Id.* at 24].

After evaluating Shear's claims, the medical opinion evidence, the medical evidence of record and the testimony at the hearing, the ALJ determined that Shear retained the residual functioning capacity (RFC) to:

> perform sedentary work as defined in 20 CFR 416.967(a) except she cannot climb ladders, ropes, or scaffolds. The claimant can occasionally climb ramps and stairs, and can occasionally engage in balancing, stooping, kneeling, crouching, or crawling. She can frequently engage in reaching, but is limited to occasional reaching overhead with the dominant right upper extremity. The claimant can frequently engage in handling and fingering, and cannot work at unprotected heights or around moving mechanical parts or other such hazards. She is limited to performing simple, routine tasks, but not at a fast pace such as at an assembly line.

[*Id.* at 25]

The ALJ consulted a vocational expert (VE) to assess whether jobs within Shear's RFC existed in significant numbers in the national economy. [*Id.* at 31] The VE identified the unskilled sedentary occupations of hand packer and assembler. The VE identified 22,000 hand packer jobs and 25,000 assembler jobs in the national economy. [*Id.* at 32] The ALJ therefore determined that Shear was not disabled within the meaning of the Social Security Act. [*Id.*]

## *LEGAL STANDARD*

To be eligible for disability insurance benefits under the Social Security Act, Shear must prove that she is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is

capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

I must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). Determining whether there is substantial evidence requires scrutinizing analysis. *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007).

I must consider evidence that supports the Commissioner's decision as well as any evidence that fairly detracts from the decision. *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). If, after reviewing the entire record, it is possible to draw two inconsistent positions and the Commissioner has adopted one of those positions, I must affirm the Commissioner's decision. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012). I may not reverse the Commissioner's decision merely because substantial evidence could also support a contrary outcome. *McNamara*, 590 F.3d at 610.

When evaluating evidence of pain or other subjective complaints, the ALJ should not ignore the subjective testimony of the claimant, even if it is

uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See e.g., Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which include:

> [The] claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.

*Id.* at 1322. When an ALJ explicitly finds that the claimant's testimony is not credible and gives good reasons for the findings, the court will usually defer to the ALJ's finding. *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007). However, the ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding. *Hildebrand v. Barnhart*, 302 F.3d 836, 838 (8th Cir. 2002).

### ANALYSIS

*A. The ALJ's determination of Shear's RFC was supported by the medical evidence of record.*

The ALJ reviewed Shear's medical records which revealed that Shear had sustain significant injuries from her motor vehicle accident. [Tr. at 27 - 29] The

17

ALJ thoroughly reviewed the record. She gave significant weight to Dr. Morgan's opinion the treatment evidence indicates that Shear's mental limitations were relatively moderate and that she could sustain simple work activity. [Id. at 28-30] Likewise, the ALJ's decision addressed the medical evidence of Shear's physical limitations that supports her RFC analysis. [Id. at 25-31] The ALJ specifically found that the residuals of Shear's spine and upper and lower body fractures limit the ability to stand and walk, lift, climb, bend, reach, handle, and finger. [Id. at 30] The ALJ noted that the most significant residuals appeared to be with the tenderness and range of motion issues with Shear's right shoulder and right ankle. [Id.] She concludes that the medical evidence shows that Shear's injuries have improved to the point where Shear could engage in sedentary work within a year of her motor vehicle accident. This conclusion is supported by substantial medical evidence outlined in the background section of this order. Dr. Columbia's examination in April 2015 found that Shear was in no distress and that she was no longer taking pain medication. Shear's only complaint was that her left hip was "popping" and that she still had problems with her right shoulder and right ankle. Shear stated that she could walk 20 feet with an assistive device. In May 2017, Dr. Kaar found that Shear walked with a normal gait and had a good range of motion in her neck. In September 2015, Dr. Gaskin found that Shear did not require a cane to stand or walk. In January 2017, x-rays of Shear's right ankle showed her fractures had healed and

the osseous alignment was unchanged. In her February and March 2017 appointments with Dr. Manchanda, his examination revealed tenderness and range of motion limitations in Shear's right shoulder and right ankle. He also noted chronic pain. The ALJ RFC determination is supported by this record. The existence of medical evidence in the record that would support a greater limitation does not invalidate the ALJ's conclusions. *McNamara*, 590 F.3d at 610.

*B. The ALJ's determination of Shear's credibility was not flawed and was supported by substantial evidence in the record.*

Shear asserts that the ALJ improperly evaluated the credibility of Shear's testimony regarding her limitations and pain. Shear's pain symptoms improved over time with treatment following her accident. In April 2015, she reported that Dr. Columbia that she was no longer using pain medications except for Tylenol. In November 2015, she told Dr. Gaskin that she was doing pretty well and that she began horse riding again and merely felt sore from that activity. In February 2017, Shear told Dr. John T. Watson that she was back to her usual activities including horseback riding. The record reveals that Shear did not take any strong prescribed medications for pain from April 2015 through February 2017 (she was prescribed Voltaren, a non-steroidal anti-inflammatory medication, for pain beginning in December 2016 ).

Although the medical record indicates that Shear walks slowly, there is nothing in the record to indicate a disabling difficultly in standing and walking. Shear has no longer needed a cane to walk by September 2015. She can walk a half mile before needing to stop. She is able to complete several chores around the house albeit not as quickly as before her accident. She pursues outside activities including telling Dr. Gaskin in April 2016, "I usually just leave when I want to. I just do what I want to." While it is true that Shear has limitations in the range of motion of her right shoulder and to her right ankle, Shear's regular activities and abilities provide substantial evidence to support the ALJ's conclusion that Shear is not disabled and retains the RFC to perform sedentary work.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner of Social Security is affirmed.

An appropriate Judgement will be entered on this date.

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 30th day of September, 2019.